**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

GUY SERGE A. FRANKIN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BAKKT HOLDINGS, INC., GAVIN MICHAEL, ANDREW MAIN, and KAREN ALEXANDER,

Defendants.

Case No. 1:25-cv-02520-MLB

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

Lead Plaintiff Guy Serge A. Frankin ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Bakkt Holdings, Inc. ("Bakkt" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased the Company's common stock between March 25, 2024 and March 17, 2025, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Bakkt is a technology company that builds software related to the selling, buying, and storage of cryptocurrency. In April 2023, the Company acquired Apex Crypto LLC, a platform for integrated crypto trading, which it renamed Bakkt Crypto. This acquisition provided the Company significant new clients and financial technology partners including Webull Pay LLC ("Webull"). Prior to its acquisition of Bakkt Crypto, revenue generated from the Company's

crypto services had been immaterial. However, in the year ending December 31, 2023, revenue from crypto services became a significant driver of the Company's business, accounting for 93.2% of the Company's revenue. Separately, the Company also operates a "Loyalty Solutions" segment that enables point redemption and fulfillment, including travel reservations.

3. Bakkt Crypto overwhelmingly contributed to the Company's purported growth. For example, Bakkt recorded a staggering $1.79 billion in the fourth quarter of 2024, a 737.9% increase on a year-over-year basis. This growth was dominated by the Company's crypto services unit. Defendants, however, concealed a significant problem in the Company's purported growth: 74% of that crypto revenue was from a single client, Webull, with 17% from loyalty services from Bank of America.

4. On March 17, 2025, after market close, Bakkt disclosed Webull was terminating its commercial agreement with the Company, effective June 14, 2025. The Company revealed that in the prior nine months ended September 30, 2024 and the full year ended December 31, 2023, ***Webull made up 74% of Bakkt's crypto services revenue***. In that same period, the Company derived 98% of its revenue from crypto services. The Company also disclosed that Bank of America was terminating its loyalty services contract with the Company, effective April 22, 2025. The Company revealed Bank of America made up 17% of Bakkt's loyalty

services revenue in the prior nine months ended September 30, 2024. The customer cancellations will collectively result in ***a 73% loss in top line revenue going forward.*** On this news, the Company's share price fell $3.50 or 27.3%, to close at $9.33 per share on March 18, 2025, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and diversity of its crypto services revenue; (2) failed to disclose Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; and (3) misrepresented the Company ability to maintain key client relationships, particularly with respect to its relationship with Bank of America. As a result of the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

8. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

9. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

**PARTIES**

10. As set forth in the previously-filed certification which is incorporated by reference herein (ECF No. 1), Plaintiff purchased the Company's common stock during the Class Period and has been damaged thereby.

11. Defendant Bakkt is incorporated under the laws of Delaware with its principal executive offices located in Alpharetta, Georgia. Bakkt's common shares trade on the New York Stock Exchange ("NYSE") under the symbol "BKKT."

12. Defendant Gavin Michael ("Michael") was the Company's Chief Executive Officer ("CEO") from January 1, 2021 until March 26, 2024.

13. Defendant Andrew Main ("Main") has been the Company's Chief Executive Officer ("CEO") since March 26, 2024. Prior to that time, he was a director of Bakkt.

14. Defendant Karen Alexander ("Alexander") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15. Defendants Michael, Main, and Alexander are collectively referred to herein as the "Individual Defendants."

16. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17. The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

18. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations, omissions, and/or half-truths during the Class Period violated these specific requirements and obligations.

20. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

21. Bakkt is a technology company that builds software related to the selling, buying, and storage of cryptocurrency. Founded in 2018, Bakkt claimed to

build technology that enabled its clients to deliver new opportunities to their customers through Software as a Service ("SaaS") and Application Programming Interface ("API") solutions that provided crypto trading capabilities and loyalty solutions for the Company's clients and customers. Bakkt also claimed to be well-positioned to provide innovative, multi-faceted product solutions to grow with the evolving crypto market. As of December 31, 2024, Bakkt had a total of only 559 employees.

22. Bakkt asserted that its platform was built to accommodate various crypto assets to offer clients the flexibility to choose some or all of its capabilities based on each client's needs and objectives. The Company maintained that its institutional-grade platform, born out of its former parent company, Intercontinental Exchange, Inc. ("ICE"), supported "know your customer" ("KYC") and anti-money laundering ("AML") capabilities, and other anti-fraud measures to combat financial crime.

23. Bakkt operated primarily through three entities: (1) Bakkt Crypto Solutions, LLC ("Bakkt Crypto"); (2) BakktX ECN, LLC; and (3) Bakkt Loyalty Solutions.

24. In April 2023, the Company acquired Apex Crypto LLC, a platform for integrated crypto trading, which it renamed Bakkt Crypto. This acquisition provided the Company significant new clients and financial technology partners

including Webull. Prior to its acquisition of Bakkt Crypto, revenue generated from the Company's crypto services had been immaterial. However, in the year ending December 31, 2023, revenue from crypto services became a significant driver of the Company's business, accounting for 93.2% of the Company's revenue. The Company claimed that Bakkt Crypto offered customers the ability to purchase, sell, store and, in approved jurisdictions, deposit and withdraw approved crypto assets, all from within the applications of Bakkt's clients with whom customers already had a relationship. Using Bakkt Crypto's platform, the Company maintained that customers could purchase approved crypto assets, store crypto assets in custodial wallets, liquidate their holdings, and transfer supported crypto assets between a custodial wallet maintained by Bakkt Crypto and external wallets in certain jurisdictions, if enabled by the client. Bakkt also asserted that its proprietary trading platform and relationships with liquidity providers provided access to a wide range of crypto assets and competitive pricing to its customers.

25. In 2024, the Company formed BakktX ECN, LLC, principally in connection with its planned launch of an institutionally-focused trading platform known as an electronic communications network ("ECN"). As part of this effort, the Company licensed Crossover Technologies proprietary matching technology that it claimed allowed clearinghouses and other trading institutions to employ smart order routing for trade matching for their users.

26. Bakkt claimed that its Loyalty Solutions business enabled clients (including financial institutions, airlines and other loyalty sponsors) to enable their customers to redeem points for items, including travel and merchandise. To that end, Bakkt maintained that its Loyalty Solutions business enabled point redemption and fulfillment, including travel reservations.

**Defendants' False and Misleading Statements**

27. The Class Period begins on March 25, 2024. On that day, Bakkt issued a press release announcing the Company's financial results for the quarter and year ended December 31, 2023. The press release touted the Company's full year and fourth quarter financial results including an alleged "***significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto.***" Specifically, the press release stated the following, in relevant part:

> **Bakkt Reports Fourth Quarter and Full Year 2023 Results**
>
> *Quarterly gross crypto services revenues of $199.4 million and associated crypto costs and execution, clearing and brokerage fees of $197.8 million*
>
> *Quarterly total revenues of $214.5 million include gross crypto revenues and net loyalty revenues; full year total revenues of $780.1 million*
>
> * * *
>
> **Fourth Quarter Financial Highlights (unaudited)**
>
> Fourth quarter 2023 results include Bakkt Crypto (f/k/a Apex Crypto, LLC), which we acquired on April 1, 2023. In accordance with

GAAP, we are presenting crypto services revenue and crypto costs and execution, clearing and brokerage fees on a gross basis since we are a principal in those transactions.

| $ in millions | 4Q23 | 4Q22 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $214.5 | $15.9 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 197.8 | 0.3 | N.M. |
| Goodwill, intangible and long-lived assets impairments | 67.4 | 285.9 | (76%) |
| Operating expenses, excluding crypto costs, execution, clearing and brokerage fees and goodwill, intangible and long-lived assets impairments | 27.8 | 61.7 | (55%) |
| Total operating expenses | 293.0 | 347.9 | (16%) |
| Operating loss | (78.5) | (332.0) | (76%) |
| Net loss | (78.7) | (326.4) | (76%) |
| Adjusted EBITDA loss (non-GAAP) | $(19.0) | $(30.5) | (38%) |

Note: "N.M" denotes Not Meaningful

• ***Key performance indicators (including historical Bakkt Crypto data for comparison purposes):***

o ***Crypto enabled accounts of 6.2 million have continued to increase steadily year-over-year.***

o Transacting accounts of 915,000 decreased 39% year-over-year, due to industrywide slowdown in crypto activity.

o ***Notional traded volume of $442 million decreased 35% year-over-year, primarily due to lower activity levels from Webull Pay customers and lower loyalty redemption activity in merchandise, travel and gift cards.***

o ***Assets under custody of $702 million increased 41% year-over-year, due to higher coin prices.***

• ***Total revenues of $214.5 million reflect a significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto. Net loyalty revenues of $15.1 million decreased 4% year-over-year driven by lower service revenue.***

* * *

## Full Year Financial Highlights

| $ in millions | FY23 | FY22 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $780.1 | $56.2 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 722.3 | 1.7 | N.M. |
| Goodwill, intangible and long-lived assets impairments | 90.8 | 1,833.6 | (95%) |
| Operating expenses, excluding crypto costs, execution, clearing and brokerage fees and goodwill, intangible and long-lived assets impairments | 195.0 | 239.9 | (19%) |
| Total operating expenses | 1,008.0 | 2,075.1 | (51%) |
| Operating loss | (227.9) | (2,018.9) | (89%) |
| Net loss | (225.8) | (1,989.9) | (89%) |
| Adjusted EBITDA loss (non-GAAP) | $(93.9) | $(119.7) | (22%) |

• Key performance indicators (including historical Bakkt Crypto data for comparison purposes):

o Notional traded volume of $1,974.3 million decreased 49% year-over-year, primarily due to lower industrywide volume and lower activity levels from Webull Pay customers.

• Total revenues of $780.1 million reflect a ***significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto.*** Net loyalty revenues of $53.1 million decreased 2% year-over-year driven by lower service revenue.

• Total operating expenses of $1,008.0 million reflect a significant increase in crypto costs and execution, clearing and brokerage fees driven by our acquisition of Bakkt Crypto.

• Operating loss of $227.9 million decreased year-over-year due to larger goodwill and intangible assets impairments recorded in the prior year.

• Net loss of $225.8 million decreased year-over-year.

• Adjusted EBITDA loss (non-GAAP) of $93.9 million decreased 22% year-over-year primarily due to a reduction in compensation and benefits costs.

28. On March 25, 2024, the Company submitted its Annual Report for the full year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "FY23 10-K"). The FY23 10-K reported the Company's Disaggregation of Revenue by platform as well as the Company's purported revenue model, wherein "***revenue from crypto services is now a significant driver of our business, and we expect crypto services revenue to increase as we grow our client base and our customers.***" Specifically, the FY23 10-K stated the following, in relevant part:

| **Platform** | **Year Ended December 31, 2023** | **Year Ended December 31, 2022** |
|---|---|---|
| Loyalty redemption platform | 53,148 | 54,479 |
| Crypto services[(b)] | 726,988 | 1,745 |
| Total revenue | $ 780,136 | $ 56,224 |

* * *

**Revenue Model**

We primarily generate revenue when clients or their customers use our services to buy, sell and/or store crypto or transact in loyalty points across our platform in the following key areas:

•*Subscription and service revenue.* We receive a recurring subscription revenue stream from client platform fees as well as

> service revenue from software development fees and call center support.
>
> •*Transaction revenue.* We generate transaction revenue from crypto buy/sell transactions, where we charge a markup on both legs of the transaction, and through loyalty redemption volumes, where we earn a margin from the difference of the value of the points being redeemed and the cost of fulfilling the redemption request.
>
> Our loyalty revenue has seasonality and is typically higher in the fourth quarter, driven by holiday spending and the travel bookings.
>
> ***Revenue generated from our crypto services had been immaterial prior to our acquisition of Bakkt Crypto; however, revenue from crypto services is now a significant driver of our business, and we expect crypto services revenue to increase as we grow our client base and our customers. As a result of our acquisition of Bakkt Crypto, we expect loyalty revenue, which prior to the Bakkt Crypto acquisition was the source of substantially all of our revenue, to be a smaller percentage of overall revenue in the future as the revenue grows from our crypto product and service offerings.***

29. The FY23 10-K further touted the Company's purported growth prospects, ability to service growing customers, and partner relationships, stating as follows in relevant part:

> We go to market using a platform strategy, driven by our clients. ***We partner with leading companies and expect to grow customers on our platform through those relationships, in addition to our direct institutional clients. We have already built an extensive network of clients across numerous industries including financial institutions, merchants and travel and entertainment.*** These clients include Webull, Public.com, Blockchain.com, Swan Bitcoin, and Caesars. We believe this strategy will enable us to add transacting accounts and volume more quickly and more efficiently than a direct-to-consumer model, given our limited operating history and the novelty of the crypto space for some customers.

> ***As part of this approach, we have developed our platform to be flexible and scalable to accommodate how different clients may want to implement our solutions.*** Depending on each client's specific needs and objectives, that client can choose to add one, some or all of our capabilities, and can also choose the manner in which those capabilities are enabled. Clients can choose to fully or partially embed our capabilities directly through Bakkt hosted user interfaces such as our Custody client portal.
>
> We believe our growth will come from adding clients and correspondingly, their customers, and increasing transaction activity as well as strategic acquisitions. Our acquisition of Bakkt Crypto has provided scale and meaningful transaction volume from Bakkt Crypto's active client base which we are working to leverage to sell additional products and services on the same platform. Leveraging Bakkt Crypto's proprietary trading platform and existing relationships with liquidity providers, we provide a wide range of assets and competitive pricing to our clients.

30. The FY23 10-K also purported to warn of the Company "dependence on a limited number of clients" stating as follows, in relevant part:

> ***A large percentage of our revenue is concentrated with a small number of clients; the loss of any such client would materially and adversely affect our business, financial condition, results of operations and future prospects. Moreover, because of our B2B2C go-to-market model, the loss of any client – regardless of the reason – increases the risk that the customers that originally emanated from that client will transition to another provider or stop doing business with us, which would harm our business.***
>
> The concentration of a significant portion of our business and transaction volume with a limited number of clients exposes us disproportionately to the risk of any of those clients choosing to no longer partner with us, to the economic performance of such clients or their respective industries or to any events, circumstances, or risks affecting such clients or their respective industries. Any such loss could make our platform less appealing to existing and potential customers. Accordingly, the loss of any significant client relationship

> could materially and adversely affect our business, results of operations, financial condition and future prospects.

31. The statements identified above in ¶¶27-30 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and diversity of its crypto services revenue; (2) failed to adequately disclose that Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; and (3) misrepresented Bakkt's ability to maintain key client relationships, such as the Company's relationship with Bank of America.

32. For example, CW1 served as a Supervisor of Customer Service Engagement for Bakkt/Aspire Loyalty Travel Solutions from March 2020 to April 2025. CW1 worked as a Customer Service Supervisor for Bakkt's Bank of America account and reported to Ferdinand Burns ("Burns"), who served as the Company's Director of Contact Center Operations. CW1 stated that Thomas Fernino ("Fernino") served as the Company's Director of Contact Center Operations prior to Burns, and that Fernino left the Company in May 2024. CW1 worked with a team of approximately 20 other dedicated employees on issues related to quality assurance, performance, and metrics.

33. In March 2024, CW1 had a conversation with Burns regarding the Company's contract with Bank of America. CW1 was concerned about stock and stock options that Bakkt had promised to pay employees. Burns told CW1 that

things were not looking good with the Company's contract with Bank of America and that there was a possibility that Bakkt would lose the contract in 2025. CW1 stated further that in March 2024, Burns also stated that Bank of America was actively threatening to cancel its contract with the Company, and that Bank of America was fed up with Bakkt. CW1 received the impression that the Company's complaints and fraud department was not meeting the criteria for Bakkt's contract with Bank of America.

34. CW1 also said that representatives of Bakkt and Bank of America held leadership meetings once a week during which the representatives discussed the Company's contract with Bank of America. CW1 stated that Burns, Lorenda Griffin ("Griffin"), Jessica Tavares ("Tavares"), Kisha Evins ("Evins") (a fraud and complaint supervisor) and Daphne Cetoute ("Cetoute") (a fraud and complaint supervisor) attended the meetings for Bakkt. CW1 believes that Michelle Maines ("Maines"), Bank of America's Senior Business Operations Manager, attended the meetings on behalf of Bank of America. CW1 stated that because of possibility that Bakkt would lose the contract with Bank of America, the Company would be unable to deliver the stock and stock options that Bakkt had promised to pay employees.

35. CW2 served as the Chief of Cypto Growth, International, for the Company from July 2023 to May 2024. In this role, CW2 led the Webull

migration. CW2 stated that perhaps Bakkt could have done a better job of informing investors of how saturated the Company's income was for Webull.

36. Additionally, the Individual Defendants were intensely focused upon the Company's relationships with Webull and Bank of America. For example, CW3 served as the Head of Financial Planning and Analysis for the Company from June 2021 to July 2024. CW3 was in direct contact with CEO Michael and CEO Main. CW3 stated that both CEO Michael and CEO Main were keenly focused upon the Company's involvement with Webull and Bank of America. In particular, CW3 stated that CEO Michael and CEO Main focused on performance and metrics supporting both Webull and Bank of America.

37. CW3 also stated that CFO Alexander paid a great deal of attention to the Company's relationships with Webull and Bank of America. CW3 stated that CW3 participated in monthly meetings with CFO Alexander to discuss financial information and strategy with respect to Webull and Bank of America. Thus, the Individual Defendants had a hands-on role with respect to the Company's relationships with Webull and Bank of America.

38. On May 15, 2024, Bakkt issued a press release announcing the Company's results for the quarter ended March 31, 2024. The press release touted the Company's first quarter 2024 financial results, including the Company's alleged "***significant increase in gross crypto services revenues driven by the***

***acquisition of Bakkt Crypto.***" Specifically, the press release stated as follows, in relevant part:

> *- $854.6 million total revenues including gross crypto revenues and net loyalty revenues*
>
> *- Strong client crypto trading activity with notional traded volume up 324% quarter-over-quarter*
>
> *- $48.8 million operating expenses excluding crypto costs, execution, clearing and brokerage fees, down 16% year-over-year*
>
> * * *
>
> **Key Performance Indicators (including historical Bakkt Crypto data):**
>
> ***• Crypto enabled accounts grew to 6.3 million, up 9% YoY.***
>
> ***• Transacting accounts decreased 34% year-over-year to 779,000, due to lower loyalty redemption and active crypto trading accounts.***
>
> • Notional traded volume increased 64% year-over-year to $1,041 million, primarily due to strong crypto trading volume partially offset by lower loyalty redemption activity in travel and gift cards.
>
> • Assets under custody increased 76% year-over-year to $1,233 million, due to higher coin prices.
>
> **First Quarter 2024 Financial Highlights (unaudited):**
>
> • Total revenues of $854.6 million reflect a ***significant increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto***. Net loyalty revenues of $13.2 million increased 4% year-over-year driven by higher service revenue.
>
> * * *

First quarter 2024 results include Bakkt Crypto (f/k/a Apex Crypto, LLC), acquired on April 1, 2023. In accordance with GAAP, crypto services revenue and crypto costs and execution, clearing and brokerage fees are presented on a gross basis as the Company is a principal in those transactions.

| $ in millions | 1Q24 | 1Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $854.6 | $13.2 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 837.6 | 0.4 | N.M. |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 48.8 | 58.3 | (16%) |
| Total operating expenses | 886.4 | 58.7 | 1411% |
| Operating loss | (31.8) | (45.4) | (30%) |
| Net loss | (21.3) | (44.9) | (53%) |
| Adjusted EBITDA loss (non-GAAP) | $(16.3) | $(28.9) | (44%) |

Note: "N.M" denotes Not Meaningful

39. On May 15, 2024, the Company submitted its quarterly report for the period ended March 31, 2024, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by platform and touted the Company's clients and its purported "***extensive network across numerous industries***" as well as the Company's alleged ability to "***meet the capability demands of our clients.***" Specifically, the quarterly report stated as follows, in relevant part:

| Platform | Three Months Ended March 31, 2024 | Three Months Ended March 31, 2023 |
|---|---|---|
| Loyalty redemption platform, net | 13,242 | 12,776 |
| Crypto services | 841,340 | 443 |
| Total revenue | $ 854,582 | $ 13,219 |

* * *

> ***Key Factors Affecting Our Performance***
>
> **Growing Our Client Base**
>
> Our ability to increase our revenue stream depends on our ability to grow clients on our platform. ***We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.*** To date, management has been focused on building through clients within a business-to-business-to-consumer ("B2B2C") model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neo-banks.
>
> **Product Expansion and Innovation**
>
> The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. ***Our ability to meet the capability demands of our clients will allow us to continue to grow revenue***.

40. The statements identified above in ¶¶38-39 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and diversity of its crypto services revenue; (2) failed to adequately disclose that Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; and (3) misrepresented Bakkt's ability to maintain key client relationships, such as the Company's relationship with Bank of America.

41. For example, in March 2024, CW1 had a conversation with Burns regarding the Company's contract with Bank of America. CW1 was concerned

about stock and stock options that Bakkt had promised to pay employees. Burns told CW1 that things were not looking good with the Company's contract with Bank of America and that there was a possibility that Bakkt would lose the contract in 2025. CW1 stated further that in March 2024, Burns also stated that Bank of America was actively threatening to cancel its contract with the Company, and that Bank of America was fed up with Bakkt. CW1 received the impression that the Company's complaints and fraud department was not meeting the criteria for Bakkt's contract with Bank of America.

42. CW1 also said that representatives of Bakkt and Bank of America held leadership meetings once a week during which the representatives discussed the Company's contract with Bank of America. CW1 stated that Burns, Griffin, Tavares, Evins, and Cetoute attended the meetings for Bakkt. CW1 believes that Maines attended the meetings on behalf of Bank of America. CW1 stated that because of possibility that Bakkt would lose the contract with Bank of America, the Company would be unable to deliver the stock and stock options that Bakkt had promised to pay employees. Additionally, CW2 stated that perhaps Bakkt could have done a better job of informing investors of how saturated the Company's income was for Webull.

43. Moreover, the Individual Defendants were intensely focused upon the Company's relationships with Webull and Bank of America. CW3 stated that both

CEO Michael and CEO Main were keenly focused upon the Company's involvement with Webull and Bank of America. In particular, CW3 stated that CEO Michael and CEO Main focused on performance and metrics supporting both Webull and Bank of America. CW3 also stated that CFO Alexander paid a great deal of attention to the Company's relationships with Webull and Bank of America. CW3 stated that CW3 participated in monthly meetings with CFO Alexander to discuss financial information and strategy with respect to Webull and Bank of America. Thus, the Individual Defendants had a hands-on role with respect to the Company's relationships with Webull and Bank of America.

44. On August 14, 2024, Bakkt issued a press release announced the Company's financial results for the quarter ended June 30, 2024. The press release touted the Company's second quarter 2024 financial results, including the Company's alleged "***increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto.***" Specifically, the press release stated as follows, in relevant part:

> ***$509.9 million total revenues including gross crypto revenues and net loyalty revenues***
>
> *$36.8 million operating expenses excluding crypto costs, execution, clearing and brokerage fees, down 43.1% year-over-year, 24.6% sequentially*
>
> * * *
>
> **Key Performance Indicators:**

• Crypto enabled accounts grew to 6.4 million, up 6.7% YoY.

• Transacting accounts decreased 39.1% year-over-year to approximately 719,281, primarily due to a large customer's reduced activity in international markets.

• Notional traded volume increased 26.6% year-over-year to $672 million, primarily due to higher trading prices for crypto assets.

• Assets under custody increased 47.7% year-over-year to $975 million, primarily due to higher trading prices for crypto assets.

**Second Quarter 2024 Financial Highlights (unaudited):**

• Total revenues of $509.9 million reflect an ***increase in gross crypto services revenues driven by Bakkt Crypto.*** Net loyalty revenues of $12.8 million increased 4% year-over-year driven by higher subscription and services revenue.

* * *

| $ in millions | 2Q24 | 2Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues[1] | $509.9 | $347.6 | 46.7% |
| Crypto costs and execution, clearing and brokerage fees | 495.1 | 334.0 | 48.2% |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 36.8 | 64.7 | (43.1%) |
| Total operating expenses | 531.9 | 398.7 | 33.4% |
| Operating loss | (22.0) | (51.1) | (56.9%) |
| Net loss | (35.5) | (50.5) | (29.7%) |
| Adjusted EBITDA loss (non-GAAP) | ($17.9) | ($24.5) | (26.9%) |

Note: "N.M" denotes Not Meaningful

45. On August 14, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the

previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by platform and touted the Company's clients and its purported "***extensive network across numerous industries***" as well as the Company's alleged ability to "***meet the capability demands of our clients.***" Specifically, the quarterly report stated as follows, in relevant part:

| **Platform** | **Three Months Ended June 30, 2024** | **Three Months Ended June 30, 2023** | **Six Months Ended June 30, 2024** | **Six Months Ended June 30, 2023** |
|---|---|---|---|---|
| Loyalty redemption platform, net | $ 12,757 | $ 12,296 | $ 25,999 | $ 25,072 |
| Crypto services | 497,141 | 335,333 | 1,338,481 | 335,776 |
| Total revenue | $ 509,898 | $ 347,629 | $ 1,364,480 | $ 360,848 |

* * *

***Key Factors Affecting Our Performance***

**Growing Our Client Base**

Our ability to increase our revenue stream depends on our ability to grow clients on our platform. ***We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.*** To date, management has been focused on building through clients within a business-to-business-to-consumer ("B2B2C") model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neo-banks.

**Product Expansion and Innovation**

The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. ***Our ability to meet the capability demands of our clients will allow us to continue to grow revenue.***

46. The statements identified above in ¶¶44-45 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and diversity of its crypto services revenue; (2) failed to adequately disclose that Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; and (3) misrepresented Bakkt's ability to maintain key client relationships, such as the Company's relationship with Bank of America.

47. In March 2024, for instance, CW1 had a conversation with Burns regarding the Company's contract with Bank of America. CW1 was concerned about stock and stock options that Bakkt had promised to pay employees. Burns told CW1 that things were not looking good with the Company's contract with Bank of America and that there was a possibility that Bakkt would lose the contract in 2025. CW1 stated further that in March 2024, Burns also stated that Bank of America was actively threatening to cancel its contract with the Company, and that Bank of America was fed up with Bakkt. CW1 received the impression that the Company's complaints and fraud department was not meeting the criteria for Bakkt's contract with Bank of America.

48. CW1 also said that representatives of Bakkt and Bank of America held leadership meetings once a week during which the representatives discussed the Company's contract with Bank of America. CW1 stated that Burns, Griffin,

Tavares, Evins, and Cetoute attended the meetings for Bakkt. CW1 believes that Maines attended the meetings on behalf of Bank of America. CW1 stated that because of possibility that Bakkt would lose the contract with Bank of America, the Company would be unable to deliver the stock and stock options that Bakkt had promised to pay employees. Additionally, CW2 stated that perhaps Bakkt could have done a better job of informing investors of how saturated the Company's income was for Webull.

49. Moreover, the Individual Defendants were intensely focused upon the Company's relationships with Webull and Bank of America. CW3 stated that both CEO Michael and CEO Main were keenly focused upon the Company's involvement with Webull and Bank of America. In particular, CW3 stated that CEO Michael and CEO Main focused on performance and metrics supporting both Webull and Bank of America. CW3 also stated that CFO Alexander paid a great deal of attention to the Company's relationships with Webull and Bank of America. CW3 stated that CW3 participated in monthly meetings with CFO Alexander to discuss financial information and strategy with respect to Webull and Bank of America. Thus, the Individual Defendants had a hands-on role with respect to the Company's relationships with Webull and Bank of America.

50. On November 14, 2024, Bakkt issued a press release announcing the Company's results for the quarter ended September 30, 2024. The press release

touted the Company's third quarter 2024 financial results, including the Company's alleged "***increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto.***" Specifically, the press release stated as follows, in relevant part:

> **Third Quarter 2024 Key Performance Indicators:**
>
> • ***Crypto enabled accounts grew to 6.5 million, up 6.7% year-over-year.***
>
> • ***Notional traded volume increased 30.1% year-over-year to $476.5 million, primarily due to stronger crypto market activity.***
>
> • Assets under custody increased 85.5% year-over-year to $938.7 million, primarily due to higher trading prices for crypto assets.
>
> • Loyalty transacting accounts decreased 41.6% year-over-year to approximately 610,568, primarily due to a credit card program divestiture by a large loyalty client.
>
> **Third Quarter 2024 Financial Highlights (unaudited):**
>
> • ***Total revenues of $328.4 million reflect an increase in gross crypto services revenues driven by Bakkt Crypto. Net loyalty revenues of $12.1 million decreased 7.2% year-over-year driven by lower notionally traded volume and redemption.***
>
> * * *
>
> • Operating loss of $27.4 million improved 48.2% year-over-year primarily due to the lapse of a $23.3 million goodwill and intangible asset impairment in third quarter of 2023 along with higher crypto services revenue, and lower compensation, SG&A and acquisition related costs.

• Net loss improved 87.8% year-over-year to $6.3 million as the third quarter of 2024 benefited from a $20.0 million gain on the fair value of warrant liability.

• Adjusted EBITDA loss (non-GAAP) increased 9.7% year-over-year to $23.7 million as the second half of 2023 benefited from a temporary brokerage business revenue share adjustment with WeBull and a decrease in loyalty revenue.

| $ in millions | 3Q24 | 3Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues[1] | $328.4 | $204.8 | 60.4% |
| Crypto costs and execution, clearing and brokerage fees | 315.0 | 190.1 | 65.8% |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 40.8 | 67.5 | (39.7%) |
| Total operating expenses | 355.8 | 257.6 | 38.1% |
| Operating loss | (27.4 | (52.9) | (48.2%) |
| Net loss | (6.3) | (51.7) | (87.8%) |
| Adjusted EBITDA loss (non-GAAP) | ($23.7) | ($21.6) | (9.7%) |

51. On November 14, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by platform and touted the Company's clients and its purported "***extensive network across numerous industries***" as well as the Company's alleged ability to "***meet the capability demands of our clients.***" Specifically, the quarterly report stated as follows, in relevant part:

| Platform | | Three Months Ended September 30, 2024 | | Three Months Ended September 30, 2023 | | Nine Months Ended September 30, 2024 | | Nine Months Ended September 30, 2023 |
|---|---|---|---|---|---|---|---|---|
| Loyalty redemption platform, net | $ | 12,086 | $ | 13,024 | $ | 38,085 | $ | 38,096 |
| Crypto services | | 316,333 | | 191,750 | | 1,654,814 | | 527,526 |
| Total revenue | $ | 328,419 | $ | 204,774 | $ | 1,692,899 | $ | 565,622 |

* * *

*Key Factors Affecting Our Performance*

**Growing Our Client Base**

Our ability to increase our revenue stream depends on our ability to grow clients on our platform. ***We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.*** To date, management has been focused on building through clients within a B2B2C model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neobanks.

**Product Expansion and Innovation**

The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. ***Our ability to meet the capability demands of our clients will allow us to continue to grow revenue.***

52. The statements identified above in ¶¶50-51 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and diversity of its crypto services revenue; (2) failed to adequately disclose that Bakkt's Crypto services revenue was substantially dependent on a

single contract with Webull; and (3) misrepresented Bakkt's ability to maintain key client relationships, such as the Company's relationship with Bank of America.

53. For instance, CW1 had a conversation with Burns regarding the Company's contract with Bank of America in March 2024. CW1 was concerned about stock and stock options that Bakkt had promised to pay employees. Burns told CW1 that things were not looking good with the Company's contract with Bank of America and that there was a possibility that Bakkt would lose the contract in 2025. CW1 stated further that in March 2024, Burns also stated that Bank of America was actively threatening to cancel its contract with the Company, and that Bank of America was fed up with Bakkt. CW1 received the impression that the Company's complaints and fraud department was not meeting the criteria for Bakkt's contract with Bank of America.

54. CW1 also said that representatives of Bakkt and Bank of America held leadership meetings once a week during which the representatives discussed the Company's contract with Bank of America. CW1 stated that Burns, Griffin, Tavares, Evins, and Cetoute attended the meetings for Bakkt. CW1 believes that Maines attended the meetings on behalf of Bank of America. CW1 stated that because of possibility that Bakkt would lose the contract with Bank of America, the Company would be unable to deliver the stock and stock options that Bakkt had promised to pay employees. Additionally, CW2 stated that perhaps Bakkt

could have done a better job of informing investors of how saturated the Company's income was for Webull.

55. Moreover, the Individual Defendants were intensely focused upon the Company's relationships with Webull and Bank of America. CW3 stated that both CEO Michael and CEO Main were keenly focused upon the Company's involvement with Webull and Bank of America. In particular, CW3 stated that CEO Michael and CEO Main focused on performance and metrics supporting both Webull and Bank of America. CW3 also stated that CFO Alexander paid a great deal of attention to the Company's relationships with Webull and Bank of America. CW3 stated that CW3 participated in monthly meetings with CFO Alexander to discuss financial information and strategy with respect to Webull and Bank of America. Thus, the Individual Defendants had a hands-on role with respect to the Company's relationships with Webull and Bank of America.

**<u>The Truth Begins to Emerge</u>**

56. On March 17, 2025, after market close, Bakkt issued a press release which disclosed Webull was terminating its commercial agreement with the Company, effective June 14, 2025. The Company revealed that in the prior nine months ended September 30, 2024 and the full year ended December 31, 2023, ***Webull made up 74% of Bakkt's crypto services revenue***. In that same period, the Company derived 98% of its revenue from crypto services. The Company also

disclosed that Bank of America was terminating its loyalty services contract with the Company, effective April 22, 2025. The Company revealed Bank of America made up 17% of Bakkt's loyalty services revenue in the prior nine months ended September 30, 2024. The customer cancellations will collectively result in ***a 73% loss in top line revenue going forward.*** Specifically, the press release stated the following, in relevant part:

> Bakkt Holdings, Inc. (the "Company") received notice from Bank of America, N.A. ("Bank of America") that Bank of America would not renew its commercial agreement with the Company. As a result, such agreement will expire in accordance with its terms on April 22, 2025, subject to the Company's obligation to maintain services for up to a 12-month transition period. Bank of America represented approximately 16% and 17% of the Company's loyalty services revenue in in the year ended December 31, 2023 and the nine months ended September 30, 2024, respectively.
>
> The Company also received notice from Webull Pay LLC ("Webull") that Webull will not renew its commercial agreement with the Company. As a result, such agreement will expire in accordance with its terms on June 14, 2025. Webull represented approximately 74% of the Company's crypto services revenue in both the year ended December 31, 2023 and the nine months ended September 30, 2024.

57. On this news, the Company's share price fell $3.50 or 27.3%, to close at $9.33 per share on March 18, 2025, on unusually heavy trading volume.

## **Post Class Period Events**

58. On March 19, 2025, Bakkt announced that "effective March 21, 2025, it will bring on Akshay Naheta, a seasoned executive with a proven track record in

the finance and technology industries, to serve as co-CEO of Bakkt, alongside Andy Main, current CEO."

59. Also on March 19, 2025, Bakkt held a conference call to discuss the Company's fourth quarter 2024 earnings. CEO Main and CFO Alexander participated in the call. During the call, CEO Main stated the following:

> I want to address an important client update. We have received notification from [Webull] that they will not be renewing their existing contract effective middle of June 2025.
>
> As their business has scaled and evolved, they're modifying our contract to run more of their own infrastructure and operations. This transition aligns with the client life cycle approach I outlined earlier, where clients may scale beyond from our comprehensive brokerage solutions as they mature, potentially shifting to our direct institutional offerings and liquidity services.
>
> [Webull] represented approximately 74% of our crypto revenues for 2024. However, we continue to have a very strong relationship with [Webull].
>
> We are working closely with their team to ensure a smooth transition for their brokerage infrastructure, and we are exploring alternative ways to continue to work together as their business scales.
>
> While this change will impact our revenue in the short term, it reinforces the importance of our strategic initiatives that I discussed earlier as we continue to support [Webull's] strategy.

60. Also during the call, CFO Alexander stated that "[a]s Andy mentioned earlier, Webull has notified us that they will not be renewing their existing contract when it ends mid-June 2025. In 2024, Webull as $2.56 billion of our gross cypto services revenue."

61. On March 20, 2025, the Company revealed the loss of Webull "raise[s] substantial doubt about [the Company's] ability to meet our obligations for at least 12 months from the date of issuance of these consolidated financial statements."

62. On August 11, 2025, Bakkt announced that CEO Main would no longer serve as CEO effective immediately. Bakkt announced CEO Main's departure on the same day that it reported its financial results for the second quarter of 2025.

## SCIENTER ALLEGATIONS

63. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bakkt, their control over, and/or receipt and/or modification of Bakkt's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bakkt,

participated in the fraudulent scheme alleged herein. Additionally, as set forth herein in detail, the facts alleged demonstrate that Defendants acted with knowledge or recklessness based upon numerous elements of scienter, including, but not limited to: (1) the accounts of confidential witnesses; (2) the Individual Defendants' hands-on management style; (3) Defendants' access to information that contradicted their public statements; (4) the core operations inference; (5) the small number of Company employees; and (6) the departures of key Company executives.

## CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NYSE. While the exact number of Class members is

unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

67. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts constituted violations of the federal securities laws;

(b) whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c) whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

70. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined

significantly as the prior artificial inflation dissipated from the Company's stock price.

71. As a direct result of Defendants' misstatements, omissions, and/or half-truths alleged herein, the Company's stock price was higher than it would have been but for Defendants' misrepresentations, omissions, and/or half-truths. Specifically, Defendants' misstatements, omissions, and/or half-truths increased the Company's stock price, maintained the Company's stock price, and/or prevented a greater decrease in the Company's stock price.

72. As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

73. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

74. The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

75. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

76. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient, electronic stock market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC and NYSE;

(c) The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

77. As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

78. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified

as "forward-looking statements" when made and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I
## Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

79. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

80. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to

disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

81. To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

82. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

83. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

84. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

85. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

86. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

87. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and

supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

88. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

89. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 15, 2025

*/s/ Marshall P. Dees*
**HOLZER & HOLZER, LLC**
Marshall P. Dees
Georgia Bar No. 105776
Corey D. Holzer
Georgia Bar No. 364698
Joshua A. Karr
Georgia Bar No. 202783
211 Perimeter Center Parkway,
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com
mdees@holzerlaw.com
jkarr@holzerlaw.com

*Liaison Counsel for Lead Plaintiff Guy Serge A. Frankin and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II (*pro hac vice forthcoming*)
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
esams@glancylaw.com
clinehan@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Lead Plaintiff Guy Serge A. Frankin and the Class*

**CERTIFICATE OF SERVICE**

I, Marshall P. Dees, hereby certify that on September 15, 2025, a true and accurate copy of the above document was electronically filed with the Clerk of the Court by using the CM/ECF system which will send Notice of Electronic Filing (NEF) to all counsel of record.

*/s/ Marshall P. Dees*
Marshall P. Dees