**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Guy Serge A. Frankin,
Individually and on Behalf of All
Others Similarly Situated,

Plaintiff,

v.

Case No. 1:25-cv-2520-MLB

Bakkt Holdings, Inc., Gavin
Michael, Andrew Main, and Karen
Alexander,

Defendants.

________________________________/

**OPINION & ORDER**

Defendant Bakkt Holdings, Inc. ("Defendant") is a technology company that, at all relevant times, operated a "crypto" business and a "loyalty" business. (Dkts. 42 ¶ 2; 49-14 at 6–8.) As part of its crypto business, Defendant offered companies a digital platform on which their customers could trade or store cryptocurrency. (Dkts. 42 ¶ 2; 49-14 at 6–7, 49–50.) As part of its loyalty business, Defendant offered companies a digital platform on which their customers could redeem loyalty points, including for travel and merchandise. (Dkts. 42 ¶¶ 2, 26; 49-14 at 8, 12–

14, 50.) Defendant's clients were the companies to which Defendant provided its platforms; the companies' customers were the platforms' end users. (*See* Dkt. 49-14 at 6–8, 13–14.)

In April 2023, Defendant acquired a financial technology company called Apex Crypto LLC—later renamed Bakkt Crypto Solutions LLC ("Bakkt Crypto")—which operated a cryptocurrency trading platform of its own. (Dkts. 42 ¶ 2; 49-14 at 6–7.) As part of the acquisition, Defendant inherited contracts between Bakkt Crypto and more than 30 of Bakkt Crypto's clients—including Webull Pay LLC ("Webull")—in which the clients agreed to make Bakkt Crypto's platform available to their customers. (Dkt. 49-14 at 7; *see* Dkt. 42 ¶ 2.) Because of Defendant's acquisition of Bakkt Crypto and its Webull contract, Defendant achieved "staggering" revenue growth in 2023 and 2024. (Dkt. 42 ¶¶ 2–4.)

In March 2025, Defendant issued a press release stating Webull would not renew its client contract, meaning the contract would expire in June 2025. (Dkt. 42 ¶ 56.) The press release noted Webull represented approximately 74% of Defendant's crypto revenue in 2023 and 2024. (Dkt. 42 ¶ 56.) Defendant also disclosed that one of its loyalty clients,

Bank of America, would not renew its contract with Defendant and would instead allow the contract to expire in April 2025. (Dkt. 42 ¶ 56.) Bank of America represented approximately 16% to 17% of Defendant's loyalty revenue in 2023 and 2024. (Dkt. 42 ¶ 56.) Defendant's share price fell 27.3% the next day. (Dkt. 42 ¶ 57.)

Plaintiff, one of Defendant's shareholders, immediately sued the company and several of its officers on behalf of himself and all other investors who purchased Defendant's common stock between March 25, 2024 and March 17, 2025 (the "Class Period"). (Dkts. 1 ¶¶ 1, 32; 42 ¶¶ 1, 64.) Plaintiff's operative complaint alleges Defendant made materially false or misleading public statements during the Class Period, in violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. (Dkt. 42 ¶¶ 79–84.) Plaintiff claims Defendant "misrepresented the stability and diversity of its crypto services revenue," "failed to disclose [Defendant's] Crypto services revenue was substantially dependent on a single contract with Webull," and "misrepresented [Defendant's] ability to maintain key client relationships, particularly with respect to its relationship with Bank of America." (Dkt. 42 ¶ 5.) Plaintiff claims these misrepresentations

artificially inflated Defendant's stock price until the truth belatedly came out in Defendant's March 2025 press release, at which point the stock price dropped and Plaintiff suffered financial loss. (Dkt. 42 ¶¶ 4–5, 70–75.)

Defendants move to dismiss Plaintiff's complaint for failure to state a claim. (Dkt. 49.) The Court grants Defendants' motion.

## I. Legal Standard

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 is one such rule that the SEC has prescribed. It prohibits any person, in connection with the purchase or sale of a security, from (1) "mak[ing] any untrue statement of a material fact" or (2) "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[T]he Supreme Court has implied a private right of action for investors under Rule 10b-5." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

"To survive a motion to dismiss, a securities-fraud claim brought under Rule 10b-5 must satisfy not only the run-of-the-mill federal notice-pleading requirements [in] Federal Rule of Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995." *Id.* at 1317–18. Rule 8(a)(2) requires plaintiff to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Rule 9(b) requires plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). And the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiff to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

This "triple-layered pleading standard" constitutes a "formidable" barrier to relief under Rule 10b-5. *Carvelli*, 934 F.3d at 1317; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1054–55 (9th Cir. 2008) ("[P]laintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid

dismissal under Fed. R. Civ. P. 12(b)(6).”). “Failure to meet any of the three standards—Rule 8(a)(2) plausibility, Rule 9(b) particularity, or the PSLRA—will result in a complaint’s dismissal.” *Plumbers, Pipefitters & Apprentices Loc. No. 112 Pension Fund v. Vestis Corp.*, 808 F. Supp. 3d 1369, 1380 (N.D. Ga. 2025).

## II. Discussion

### A. Puzzle Pleading

Defendants say the Court should dismiss Plaintiff’s complaint as an impermissible “puzzle pleading” because the complaint does not “connect any specific challenged statement” to any specific “reason for falsity,” in violation of the PSLRA. (Dkt. 49-1 at 30–31.) The Court agrees.

Under the PSLRA, a Rule 10b-5 complaint must identify “which specific statements are materially false or misleading” and “which reasons match with which statements.” *Marselis v. Fox Factory Holding Corp.*, 2026 WL 369923, at *5 (N.D. Ga. Feb. 10, 2026); *see In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009) (Rule 10b-5 complaint must “link” a “specific statement[]” to “specific factual allegations demonstrating . . . why the statement was false or misleading”). Plaintiff’s complaint does not do this. Instead, it copies

and pastes more than 10 pages of Defendant's press releases and SEC filings, sporadically emphasizing portions of the quoted text in bold italics without explanation. (*See* Dkt. 42 ¶¶ 27–30, 38–39, 44–45, 50–51.) Then, in a single generalized paragraph, it says "[t]he statements identified above . . . were materially false and misleading" because they "(1) misrepresented the stability and diversity of [Defendant's] crypto services revenue; (2) failed to adequately disclose that [Defendant's] Crypto's services revenue was substantially dependent on a single contract with Webull; and (3) misrepresented [Defendant's] ability to maintain key client relationships, such as [Defendant's] relationship with Bank of America." (Dkt. 42 ¶¶ 31, 40, 46, 52.)

These allegations leave the Court to guess whether Plaintiff is challenging (1) every statement in the 10+ pages of block quotes, (2) only the statements he emphasizes in bold italics, or (3) some other subset of Defendant's quoted language. Read literally, Plaintiff's allegation that "[t]he statements identified above . . . were materially false and misleading" might suggest he is challenging every word in the block quotes. But the quotes include statements that lack any obvious connection to Plaintiff's explanation of falsity, which suggests Plaintiff's

focus may be narrower. (*See, e.g.*, Dkt. 42 ¶¶ 28 ("Our loyalty revenue has seasonality and is typically higher in the fourth quarter, driven by holiday spending and the travel bookings."), 38 (Defendant's operating expenses were $48.8 million during the first quarter of 2024).)

Perhaps when Plaintiff says "[t]he statements identified above" were false or misleading, he really means is "the statements identified above *in bold italics*"—that is, option (2). But there are problems with this reading, too. Plaintiff inconsistently emphasizes the same language—or virtually the same language—throughout his complaint. (*Compare, e.g.*, Dkt. 42 ¶ 50 (emphasizing "Crypto enabled accounts grew to 6.5 million, up 6.7% year-over-year"), *with* Dkt. 42 ¶ 44 (not emphasizing "Crypto enabled accounts grew to 6.4 million, up 6.7% YoY").) And he often quotes entire paragraphs without emphasizing any language at all. (*See, e.g.*, Dkt. 42 ¶¶ 29–30); *see City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1291 (N.D. Ga. 2011) ("It cannot seriously be alleged that every word of the quoted statements is materially false or misleading, but in light of the fact that some of the paragraphs do not contain any emphasized language, neither can it be said that Plaintiffs' allegations of material

misstatements are confined only to those statements that are emphasized.”).

That leaves option (3)—that Plaintiff is challenging some unspecified subset of the language he quotes. This is the most likely explanation because Plaintiff's opposition brief identifies only a portion of Defendant's quoted statements as false or misleading, leaving out many emphasized statements from the complaint. (*See* Dkt. 51 at 19–25.) That Plaintiff's brief addresses only a subset of Defendant's quoted statements—without any obvious guiding principle—is a tacit admission that his complaint violates the PSLRA. *See In re 2007 Novastar*, 579 F.3d at 882–83 (where plaintiff's complaint quoted several pages of defendant's communications but plaintiff's brief identified as false or misleading only "specific statements within these communications," plaintiff "appear[ed] to recognize" the complaint did not adequately "identify what statements were allegedly false or misleading").

"Identifying specifically the false or misleading statements for the first time [in a brief] . . . does not excuse [Plaintiff's] failure to" do so in his complaint. *Id.* But even if it did—that is, even assuming the Court could use Plaintiff's brief to identify the statements at issue—the Court

would still have to piece together which of the three falsity reasons (stability/diversity of crypto revenue, dependence on Webull, or ability to maintain clients) applies to which statement and why. Plaintiff has not done that work in his complaint, which is an independent ground for dismissal under the PSLRA. *See Marselis v. Fox Factory Holding Corp.*, 2025 WL 817434, at *4–5 (N.D. Ga. Mar. 13, 2025) (dismissing Rule 10b-5 claim because plaintiff failed to specify which of three falsity reasons applied to which statement and why).

Courts have repeatedly condemned complaints that set forth "long block quotes with unexplained emphases" followed by "generalized explanations of how the statements were false or misleading." *City of Pontiac*, 806 F. Supp. 2d at 1291–94; *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008); *see Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–78 (S.D.N.Y. 2021) ("[A] complaint predominantly marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false fails to state a claim because it is insufficiently particular under the PSLRA."). Such complaints—often referred to as "puzzle pleadings"—improperly place the burden on the court to "search the long quotations in the complaint

for particular false statements, and then determine on its own initiative how and why the statements were false." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012); *see, e.g.*, *Anastasio v. Internap Network Servs. Corp.*, 2010 WL 11459838, at *5–6 (N.D. Ga. Sept. 15, 2010) (plaintiffs improperly "placed the burden on the reader to sort out the statements and match them with the corresponding adverse facts" because the complaint included "long block quotes," "put some portions of the quotes in bold and italicized text," and alleged the quotes were false or misleading based on "the same conclusory list of omissions or deficiencies").[1] Just so here. Plaintiff does

[1] *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs list various statements—often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts—then follow each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false. Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards."); *see also Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023) ("an allegation of every misleading statement or omission must be accompanied by an explanation about why it is misleading," and plaintiffs' complaint violated this rule because it "contain[ed] long block quotes" without adequately "explain[ing] why those block quotes . . . [were] misleading, leaving the reader to puzzle over the allegations in an

not "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 789 (11th Cir. 2010). And the Court will not do that work for him. So the Court dismisses Plaintiff's complaint as an impermissible puzzle pleading under the PSLRA.[2]

**B. Actionable Misrepresentation or Omission**

Defendants also argue the Court should dismiss Plaintiff's complaint for failure to plead an actionable misrepresentation or omission. (Dkt. 49-1 at 31–39.) The Court agrees. Even looking at the specific statements that Plaintiff identifies as false or misleading in his brief, dismissal is warranted because none of the statements are actionable under Rule 10b-5.

---

attempt to piece them together"); *Alms v. Luminar Techs., Inc.*, 2024 WL 2803261, at *5 n.5 (M.D. Fla. May 31, 2024) ("Many of [defendant's] statements appear as block quotes, which leaves the court speculating concerning which parts of the statements Plaintiff challenges and why.").

[2] For essentially the same reasons, Plaintiff also does not plead fraud with the particularity required under Rule 9(b). *See Carvelli*, 934 F.3d at 1318 (noting the "overlap" between the PSLRA and Rule 9(b)).

### 1. Statements about Defendant's Past Financial Performance

Plaintiff first challenges the following financial statements in Defendant's quarterly releases and SEC filings:

- "Crypto enabled accounts of 6.2 million have continued to increase steadily year-over-year." (Dkts. 42 ¶ 27; 51 at 19.)
- "Crypto enabled accounts grew to 6.3 million, up 9% YoY." (Dkts. 42 ¶ 38; 51 at 23.)
- "Crypto enabled accounts grew to 6.5 million, up 6.7% year-over-year." (Dkts. 42 ¶ 50; 51 at 24.)
- "Assets under custody of $702 million increased 41% year-over-year, due to higher coin prices." (Dkts. 42 ¶ 27; 51 at 19.)
- "Total revenues of $214.5 million reflect a significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto." (Dkts. 42 ¶ 27; 51 at 19.)
- "Total revenues of $780.1 million reflect a significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto." (Dkts. 42 ¶ 27; 51 at 19.)
- "Total revenues of $854.6 million reflect a significant increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto." (Dkts. 42 ¶ 38; 51 at 23.)
- "Total revenues of $509.9 million reflect an increase in gross crypto services revenues driven by Bakkt Crypto." (Dkts. 42 ¶ 44; 51 at 24.)
- "Total revenues of $328.4 million reflect an increase in gross crypto services revenues driven by Bakkt Crypto." (Dkts. 42 ¶ 50; 51 at 25.)

- "$509.9 million total revenues including gross crypto revenues and net loyalty revenues." (Dkts. 42 ¶ 44; 51 at 24.)
- "Net loyalty revenues of $15.1 million decreased 4% year-over-year driven by lower service revenue." (Dkts. 42 ¶ 27; 51 at 19.)
- "Net loyalty revenues of $12.1 million decreased 7.2% year-over-year driven by lower notionally traded volume and redemption." (Dkts. 42 ¶ 50; 51 at 25.)

Plaintiff does not dispute the "literal truth" of these statements. (Dkt. 51 at 26–27.) But he claims the statements are actionable as "half-truths" because they "gave investors the false and misleading impression that [Defendant's] crypto services revenue was stable and diverse, and that [Defendant] would be able to maintain its key client relationships." (Dkt. 51 at 26–27.) The Court disagrees.

"Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011); *see Boca Raton*, 506 F. App'x at 38 ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings."); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities law cannot be premised upon a company's

disclosure of accurate historical data."). Defendant's financial reports were accurate and are thus protected by this rule. The "general report[s]"—presented in routine financial disclosures—did not imply "all was well within every component of the company that could possibly affect revenue in the future" (much less in the specific components on which Plaintiff focuses). *FindWhat*, 658 F.3d at 1306. So the statements were not misleading under Rule 10b-5. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021) (a company's "disclosure of accurate historical [financial] data, standing alone, is not actionable," even if the company "fail[s] to simultaneously disclose" related issues); *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275 (11th Cir. 2016) ("Given that Galectin's 10-K and 10-Q reports did no more than accurately report the number of shares sold, the price per share, and the net proceeds, we cannot say that Galectin, by reporting those figures, created a duty for itself to disclose that it had engaged and paid third parties to promote its stock.").

The Court dismisses Plaintiff's claims as much as they challenge Defendant's statements about its past financial performance.[3]

**2. Statements about Defendant's Future Revenue**

Plaintiff next challenges the following paragraph in Defendant's 2023 annual report, which Defendant filed with the SEC in March 2024:

> Revenue generated from our crypto services had been immaterial prior to our acquisition of Bakkt Crypto; however, revenue from crypto services is now a significant driver of our business, and we expect crypto services revenue to increase as we grow our client base and our customers. As a result of our acquisition of Bakkt Crypto, we expect loyalty revenue, which prior to the Bakkt Crypto acquisition was the source of substantially all of our revenue, to be a smaller percentage of overall revenue in the future as the revenue grows from our crypto product and service offerings.

(Dkts. 42 ¶ 28; 51 at 20.)

Again, as best the Court can tell, Plaintiff does not dispute the literal truth of these statements. Defendant's crypto revenue *was*

---

[3] To the extent that a few of Defendant's statements contain not just numbers but also a minor explanation or commentary on those numbers, Plaintiff has not shown these limited additional representations were false or misleading. (*See, e.g.*, Dkt. 42 ¶¶ 27 ("Assets under custody of $702 million increased 41% year-over-year, *due to higher coin prices*." (emphasis added)), 38 ("Total revenues of $854.6 million *reflect a significant increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto*." (emphasis added)), 50 ("Net loyalty revenues of $12.1 million decreased 7.2% year-over-year *driven by lower notionally traded volume and redemption*." (emphasis added)).)

immaterial before the Bakkt Crypto acquisition. (*See* Dkt. 42 ¶ 2 ("Prior to its acquisition of Bakkt Crypto, revenue generated from the Company's crypto services had been immaterial.").) Crypto revenue became a significant driver of Defendant's business in 2023–2024. (*See* Dkt. 42 ¶ 2 ("[I]n the year ending December 31, 2023, revenue from crypto services became a significant driver of the Company's business.").) Defendant's crypto revenue did grow, at least initially, after Defendant published its 2023 annual report. (*See* Dkt. 42 ¶ 3 ("[Defendant] recorded a staggering $1.79 billion in the fourth quarter of 2024, a 737.9% increase on a year-over-year basis. This growth was dominated by the Company's crypto services unit.").) Defendant's loyalty business had generated most of the company's revenue previously. (*See* Dkts. 42 ¶ 28 (Defendant's annual report showing loyalty revenue accounted for approximately $54 million of Defendant's total revenue of $56 million in 2022); 51 at 26–27 (Plaintiff acknowledging Defendant accurately reported its financial results).) And Defendant's loyalty revenue represented a smaller percentage of Defendant's total revenue as time went on. (*See* Dkt. 42 ¶¶ 28, 51 (Defendant's

loyalty revenue as a percentage of Defendant's total revenue dropped from 97% in 2022 to 7% in 2023, to 2% by the end of the third quarter in 2024).)

Plaintiff instead argues the statements—though technically accurate—were materially misleading because Defendant did not disclose "how saturated the Company's income was for Webull" or that "Bank of America was actively threatening to cancel its [client] contract." (Dkt. 51 at 22–23, 28–29.) The Court disagrees.

Defendant's first alleged omission—"how saturated the Company's income was for Webull"—is a nonstarter because Defendant *did* disclose Webull's outsized contribution to the company's revenue. Defendant's annual report said "[a] large percentage of our revenue is concentrated with a small number of clients," Defendant's top three crypto clients generated approximately 86% of Defendant's crypto revenue in 2023, "one client"—ostensibly Webull—was responsible for $529.6 million of Defendant's total crypto revenue of $727 million that year, and "[t]he concentration of a significant portion of our business and transaction volume with a limited number of clients exposes us

disproportionately to the risk of any of those clients choosing to no longer partner with us." (Dkt. 49-14 at 16, 23, 53–54.) This language adequately disclosed what Plaintiff now faults Defendant for omitting: Defendant's "[c]rypto services revenue was substantially dependent on a single contract with Webull." (Dkt. 42 ¶¶ 5, 31, 40, 46, 52.)

True, the annual report did not disclose "Bank of America was actively threatening to cancel its [client] contract." But it didn't need to because Defendant never suggested otherwise. "A corporation has a duty to neutralize only the natural and normal implication of its statements." *FindWhat*, 658 F.3d at 1305. This means a statement is misleading only if "a reasonable investor, in the exercise of due care, would have" understood the statement to "naturally impl[y]" something false. *Id.* at 1305–06.

That standard is not met here. No reasonable investor would have read the paragraph in Defendant's annual report to mean that any particular client, much less a loyalty client like Bank of America, was satisfied with its contract and intended to continue its relationship with Defendant. The paragraph focused on

Defendant's *crypto* revenue growth, which had little to do with Bank of America's *loyalty* contract. And when Defendant did mention its loyalty business, it did so only to note the business would play a *smaller* role in Defendant's revenue going forward. Downplaying a business hardly constitutes an implicit certification that the clients in that business will stick around (if anything, it suggests the opposite). And the mere fact that Defendant "reveal[ed] one fact" about its loyalty business did not require it to "reveal all others," even if the other information would have been "interesting, market-wise." *Id.* at 1305; *see Smith v. Gap, Inc.*, 177 F.4th 405, 412 (2d Cir. 2026) ("A company's decision to speak about one aspect of sales does not necessarily require it to address other issues . . . . materially impacting sales.").

The annual report also contained cautionary language that makes it even harder to read the challenged paragraph as some statement about the future stability of Defendant's relationship with Bank of America. *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) ("To decide whether a misstatement or omission can mislead, we need to look at the context surrounding

the statement," including "surrounding text" like "hedges, disclaimers, and apparently conflicting information"); *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014) (statements were not false or misleading when "[v]iewed in context"). For example, the report warned investors that Defendant may be "unable to . . . retain" its clients, Defendant's platforms may not "gain the acceptance of clients," clients could move their business to Defendant's competitors, Defendant's client relationships could "change[]," client contracts were only for one to three years, some clients could "terminate those agreements without cause upon 30 to 90 days' prior written notice," Defendant's ability to retain clients "depend[ed] on the willingness of those clients," Defendant faced "intense" competition to keep its clients and there was "no assurance" it could do so, Defendant's failure to meet client expectations "could result in the dissatisfaction or loss of clients," clients were unsettled after Defendant publicly expressed doubts in February 2024 about its "ability to continue as a going concern," it was unclear whether Defendant could "recover with [clients]"

given the fallout from that incident, and in February 2024 Bank of America dramatically reduced Defendant's credit line, increased Defendant's required payment frequency, and asked Defendant to pledge collateral. (Dkt. 49-14 at 16–22, 25–26, 45; *see* Dkt. 49-10 at 5.)

These "cautionary warnings" put investors on notice that Defendant "could face sudden [client] troubles," including from Bank of America. *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 962 (6th Cir. 2026). Given the clarity of that notice and the "generality" of the language Plaintiff challenges, "no fair investor would [have] read [the paragraph in Defendant's annual report] as guaranteeing the safety of any one [client], [Bank of America] included." *Id.* at 962–63 (touting client relationships did not misleadingly suggest a client would continue its relationship with the company, including because the statement involved only "generic remarks" and was accompanied by "[m]ultiple cautionary warnings"); *see City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *7 (S.D. Fla. June 21, 2016)

("isolated statements" were not misleading "given the surrounding language and the documents in their entirety").[4]

Plaintiff has not shown the challenged paragraph in Defendant's 2023 annual report was false or misleading. So the Court dismisses Plaintiff's claims as much as they are based on that paragraph.

### 3. Statements about Defendant's Clients

Finally, Plaintiff challenges Defendant's statements—made in various SEC filings—about its "extensive network of clients" and its "partner[ship] with leading companies:"

- "We partner with leading companies and expect to grow customers on our platform through those relationships, in addition to our direct institutional clients. We have already built an extensive network of clients across numerous industries including financial institutions, merchants and travel and entertainment." (Dkts. 42 ¶ 29; 51 at 20.)

---

[4] Plaintiff claims Defendant's cautionary language about potential client loss was itself misleading because "the unfavorable events" about which Defendant warned "ha[d] already occurred." (Dkt. 51 at 20–21.) Not so. Although Bank of America was allegedly "threatening" to cancel its client contract around the time Defendant filed its annual report in March 2024, it did not follow through on that threat until later (and, even then, it only declined to renew the contract—it did not cancel it). (*See* Dkt. 42 ¶¶ 33–34 (alleging only "a possibility" in March 2024 that Defendant would lose its Bank of America contract in 2025), 56 (Bank of America declined to "renew" its contract).) And nothing in the complaint suggests Webull expressed any desire at all—much less formally decided—to part ways with Defendant as of March 2024.

- "We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment." (Dkts. 42 ¶¶ 45, 51; 51 at 24–25.)

Again, Plaintiff's theory is not that these statements were false but that they were misleading because Defendant did not disclose "how saturated the Company's income was for Webull" or that "Bank of America was actively threatening to cancel its contract." (Dkt. 51 at 20–24, 28–29.) This theory fails.

Defendant's "generic remarks" regarding its "client base" would not have "misled a reasonable investor" into believing anything about Webull's revenue contribution or about Defendant's ability to retain its loyalty contract with Bank of America. *Newtyn Partners*, 165 F.4th at 960–63 (although defendant failed to disclose that its second-largest customer "intended to terminate its contract," defendant did not mislead investors by claiming it "maintained deep, long-standing relationships" with its customers). The first paragraph also appeared in Defendant's 2023 annual report, which, as explained above, adequately disclosed Webull's significance and repeatedly warned investors about Defendant's potential inability to retain its clients.

As Defendants point out, the statements in both paragraphs are also non-actionable because they are corporate "puffery" that no "reasonable investor, exercising due care, would view as moving the investment-decision needle." *Carvelli*, 934 F.3d at 1320; (*see* Dkts. 49-1 at 38; 49-3). The statements vaguely predict client/customer "grow[th]" and tout Defendant's "extensive network of clients" and "collaborat[ion] with leading brands." Courts routinely dismiss these sorts of "airy" comments as "corporate banalities" that are too "insignificant" to support a securities-fraud claim. *Id.* at 1321–22; *see, e.g.*, *Herman v. Legent Corp.*, 1995 WL 115879, at *4 (4th Cir. Mar. 20, 1995) ("vague statements predicting growth" are "commonplace commercial puffery" and thus "not actionable"); *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003) (favorably citing another court's holding that the statement "we expect 1993 to mark another year of strong growth in earnings per share" was "non-actionable puffery"); *Newtyn Partners*, 165 F.4th at 960–61 (concluding the following statements were non-actionable puffery: (1) defendant "maintained deep, long-standing relationships with large consumer-based businesses, including well-known worldwide brands," and (2) defendant had "a stable client base

that generates recurring campaign demand"); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 173 (2d Cir. 2021) (characterizing the following statement as non-actionable puffery: "Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands").[5]

Plaintiff has not shown Defendant's statements about its clients were misleading or material. So the Court dismisses Plaintiff's claims as much as they are based on those statements.

**C. Conclusion**

The Court grants Defendants' motion and dismisses Plaintiff's complaint as an impermissible puzzle pleading and for failure to plead

[5] *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427–28 (3d Cir. 1997) (Alito, J.) (company's statement that it "believed it could continue to grow net earnings at a faster rate than sales" was "too vague to be actionable"); *Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 785–86 (3d Cir. 2007) (company's statement that it was "slated to begin to generate strong revenue and earnings growth in 2002" was "puffery").

an actionable misrepresentation or omission under Section 10(b) and Rule 10b-5.[6]

### D. Leave to Amend

Plaintiff's response brief includes a vague, perfunctory request to amend his claims "if the Court grants any portion of [Defendant's] Motion." (Dkt. 51 at 45.) Defendants say this request is improper. (Dkt. 54 at 27.) The Court agrees.

"Filing a motion is the proper method to request leave to amend a complaint." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999). Even then, the motion must "(1) set forth the substance of the proposed amendment, or (2) attach a copy of the proposed amendment to the motion." *Mandala v. Tire Stickers, LLC*, 829 F. App'x 896, 902 (11th Cir. 2020). "Where a request for leave to file an amended complaint simply is

---

[6] To the extent that Plaintiff also asserts a claim under Section 20(a) of the Securities Exchange Act of 1934, the Court dismisses that claim for failure to plead a violation of Section 10(b). (Dkts. 42 ¶¶ 85–89; 49-1 at 49); *see FindWhat*, 658 F.3d at 1294 n.9 ("[N]o § 20(a) claim can lie without first establishing a successful § 10(b) claim."); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 860 (11th Cir. 2015) ("Section 20(a) liability derives from liability under § 10(b) . . . . Since there was no § 10(b) liability, there is no derivative liability on which to base a § 20(a) claim.").

embedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009).

Plaintiff has not filed a motion to amend. Nor has he "attach[ed] the proposed amendment or set forth the substance of the proposed amendment, as required." *My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 803 (11th Cir. 2019). All he has done is embed a "cursory and conditional request to amend in [his] response in opposition to [Defendant's] motion to dismiss." *Ferrell v. Durbin*, 311 F. App'x 253, 259 (11th Cir. 2009). That is insufficient under well-established law. *Id.* So the Court denies Plaintiff's request and declines to permit an amendment here. *See Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) ("[Plaintiff] failed to properly move for leave to amend, and the district court soundly rejected the infirm request."); *Britton ex rel. U.S. v. Lincare Inc.*, 634 F. App'x 238, 241 (11th Cir. 2015) (district court properly dismissed complaint without leave to amend because plaintiff "failed to set forth how he would amend his complaint to comply with Rule 9(b)").[7]

---

[7] Even if Plaintiff had properly sought leave to amend, the Court would deny his request on futility grounds because nothing suggests he could

## III. Conclusion

The Court **GRANTS** Defendants' Motion to Dismiss (Dkt. 49), **DENIES** as unnecessary Defendants' Request for Oral Argument (Dkt. 55), and **DISMISSES** this case **WITH PREJUDICE**.

**SO ORDERED** this 17th day of September, 2026.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

state a claim based on the allegedly false or misleading statements identified in his complaint. *See Taveras v. Bank of Am., N.A.*, 89 F.4th 1279, 1289 (11th Cir. 2024) ("When the complaint as amended would still be dismissed, the district court may properly deny a motion for leave to amend as futile.").